STATE OF CONNECTICUT *v.* MARSH AND
MCLENNAN COMPANIES, INC., ET AL.
(SC 17861)

Norcott, Katz, Palmer, Vertefeuille and Schaller, Js.

Argued January 4—officially released April 15, 2008

*Matthew J. Budzik*, assistant attorney general, with whom were *Arnold B. Feigin*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Michael E. Cole*, assistant attorney general, for the appellant (state).

*Michael P. Shea*, with whom were *Thomas J. Groark, Jr.*, and, on the brief, *Mitchell R. Harris* and *Howard Fetner*, for the appellees (defendants).

Opinion

NORCOTT, J. The sole issue in this interlocutory public interest appeal is whether General Statutes § 35-32 (c) (2)[1] gives the plaintiff, the state of Connecticut

[1] General Statutes § 35-32 provides: "(a) The Attorney General, in the name of the state and on behalf of the people of the state, shall enforce the provisions of this chapter. He shall investigate suspected violations and institute proceedings, for any violation of the provisions of this chapter. Such proceedings may pray that such violation be temporarily or permanently enjoined, or otherwise prohibited.

"(b) The Attorney General may also, in his discretion, intervene and appear in any proceeding pending before any court, agency, board, or commission in this state in which matters related to this chapter are in issue.

"(c) The Attorney General may also, in enforcing the provisions of this chapter, bring an action in the name of the state as (1) parens patriae for persons residing in the state with respect to damages sustained by such persons, or, if the court finds in its discretion that the interests of justice so require, as a representative of a class or .classes consisting of persons residing in the state who have been damaged; or (2) *parens patriae with respect to damages to the general economy of the state or any political subdivision thereof*; provided that such damages shall not be duplicative of those recoverable under subdivision (1) of this subsection.

"(d) The Attorney General may also bring a civil action in the name of the state in the district courts of the United States under the federal antitrust laws to recover damages and secure such other relief as provided for in such laws as (1) parens patriae for persons residing in the state with respect to damages sustained by such persons, or, if the court finds in its discretion

(state), standing to pursue a parens patriae claim for damages to its general economy caused by violations of the Connecticut Antitrust Act (antitrust act), General Statutes § 35-24 et seq. The state appeals, upon the grant of its application filed pursuant to General Statutes § 52-265a,[2] from the order of the trial court dismissing its claim for damages to the state's general economy against the defendants, the Marsh and McLennan Companies, Inc., and its numerous subsidiary and operating units,[3] alleging, inter alia, that they had violated the

that the interests of justice so require, as a representative of a class or classes consisting of persons residing in the state who have been damaged; or (2) parens patriae with respect to damages to the general economy of the state or any political subdivision thereof; provided that such damages shall not be duplicative of those recoverable under subdivision (1) of this subsection." (Emphasis added.)

[2] General Statutes § 52-265a provides in relevant part: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice. . . ."

Because Chief Justice Rogers was unavailable or disqualified from this case, Justice Norcott, as the most senior associate justice, who was available, considered and granted the state's unopposed application pursuant to Practice Book § 83-4. Moreover, we note that this interlocutory appeal properly is before this court because "the 'order or decision' referred to in § 52-265a [a] from which an appeal may be taken need not be a final judgment . . . ." *Laurel Park, Inc. v. Pac*, 194 Conn. 677, 678–79 n.1, 485 A.2d 1272 (1984).

[3] In addition to Marsh and McLennan Companies, Inc., which is a global business services firm with its principal place of business in New York, New York, the state named as defendants: (1) Marsh, Inc., which is a subsidiary and operating unit of Marsh and McLennan Companies, Inc.; (2) Marsh and McLennan, Inc., a brokerage and consulting corporation with its principal place of business in New York, New York, which is a wholly owned subsidiary of Marsh, Inc.; and (3) Marsh USA, which is an insurance brokering and consulting corporation with its principal place of business in Hartford, and is a wholly owned subsidiary of Marsh and McLennan, Inc.

The state also initially named ACE Financial Solutions, Inc. (ACE), as a defendant, but subsequently withdrew the action as to ACE. Accordingly,

antitrust act by conspiring to rig bids for the sale of excess casualty insurance. We conclude that the state has standing to pursue a parens patriae antitrust claim for damages to its general economy pursuant to § 35-32 (c) (2). Accordingly, we reverse the decision of the trial court.

The record reveals the following relevant factual allegations and procedural history.[4] The defendants, who together constitute the world's largest provider of insurance brokerage and consulting services, have gained considerable market power because of mergers by other key firms in their industry. The defendants' clients rely on their expertise in choosing their insurance coverage and in deciding the appropriate costs for that coverage.

The defendants, like most brokers, are compensated either by flat fees or by contingency fees based on percentages of the premiums that their clients pay to their insurers. Unbeknownst to their clients, the defendants entered into separate agreements with their insurers, known interchangeably as "placement service agreements," "market service agreements" or "overrides" (agreements). These agreements resulted in the insurers paying percentage based bonuses to the defendants in exchange for their steering a certain percentage

ACE is not a party to this appeal, and we refer to Marsh and McLennan Companies, Inc., and its subsidiary units as the defendants.

[4] Our statement of the facts in this appeal from an order of the trial court dismissing one of the state's claims is taken from the facts stated in the operative complaint, construed in the "manner most favorable to the pleader." (Internal quotation marks omitted.) *Cogswell* v. *American Transit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007).

The operative complaint is the third amended complaint, which the state filed after the trial court had overruled its objection to the defendants' request to revise the second amended complaint. Specifically, the defendants had requested the state to plead facts supporting its claim that their activities actually damaged the state's general economy, and also to demonstrate that those damages would meet the requirement of § 35-32 (c) (2) such that they not be duplicative of those recoverable under § 35-32 (c) (1).

of their clients to the insurers, either for new policies or renewals. The state alleges that the agreements were "pure profit" and became a "significant source of [the defendants'] income"; specifically, more than one half of their 2003 net income. The state alleges that the agreements created a conflict of interest between the defendants and their clients, as they had the purpose and effect of elevating prices in the market for excess casualty insurance.

In the late 1990s, the defendants created their Global Broking Unit (unit), which required insurance companies that desired to serve their clients to negotiate with one centralized national entity, rather than with regional brokers whose decisions affected insurance placements only in their individual markets. Any insurer desiring access to the defendants' clients was required to negotiate through the unit, which meant that insurers who refused to enter into agreements with the defendants, or to participate in price fixing or false quotes,[5] were denied access to the defendants' clients nationwide, rather than just in discrete geographic areas. Thus, the insurers typically consented to pay the agreements, and subsequently increased those payments to attract even more business from the defendants and their clients. Those payments resulted in increased premium prices, which ultimately were paid by the defendants' clients.[6] Indeed, the agreements led

[5] The state's complaint alleged that some insurers that cooperated with the defendants' scheme would provide the defendants and their clients with "B-quotes," or fraudulent bids providing the illusion of either decreased coverage or a higher price, to create the appearance of the defendants' clients receiving the best bid.

[6] According to the state's complaint, over time, as the agreements produced more money for the defendants, they became concerned that their clients would learn of the secret payments. The defendants' brokers informed the insurers, which prepared the federally mandated disclosure statements made available to the clients, that they did not want the bonus payments reported.

one insurer to maintain a separate schedule of prices for insurance placed with the defendants' clients. The defendants' clients received no benefit in exchange for these increased premiums, as the brokers would place their clients with insurers that would pay them the highest commission regardless of the appropriateness or quality of the insurance coverage.

The state alleges that the defendants' bid rigging and price fixing scheme resulted in artificially increased premium rates, which were set by them rather than determined by the competitive market. Because of the defendants' dominant market position and the widespread nature of the scheme, this resulted in increased prices even for those consumers who purchased their coverage from other insurers that did not cooperate with the defendants' demands. The state alleges that the defendants' actions caused prices in the market for excess casualty insurance to increase by 15 to 20 percent.

The defendants' clients that allegedly were harmed by this scheme include some of Connecticut's largest corporations, universities, hospitals and municipalities. Indeed, the state asserts that even the state government itself was harmed by a secret kickback that an insurer had paid to the defendants and rolled into the premium price, despite the existence of an agreement that the defendants' commission would be paid only by the state, in an attempt to procure the best possible insurance service and terms for the state.

The state brought this action against the defendants, alleging that their actions violated the antitrust act and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and also constituted breach of contract, breach of fiduciary duty, and negligent misrepresentation. With respect to the antitrust claims, the state seeks injunctive relief, damages for

injury to its general economy pursuant to § 35-32 (c) (2), and civil penalties of $250,000 for each violation of the antitrust act pursuant to General Statutes § 35-38.[7] With respect to its CUTPA claims, the state seeks injunctive relief, an order for an accounting, civil penalties of $5000 for each violation, an order of restitution, an order of disgorgement and attorney's fees. The state seeks compensatory damages with respect to its common-law counts.

The defendants subsequently moved to strike, inter alia, the state's second and third prayers for relief on its antitrust act claim, namely, those counts seeking injunctive relief and damages to the state's general economy pursuant to § 35-32 (c) (2). The trial court, sua sponte, raised the issue of its subject matter jurisdiction, namely, whether the state had standing to seek damages to its general economy under § 35-32 (c) (2). Specifically, the trial court noted that the state's authority to pursue general economic damages under § 35-32 (c) (2) is not altogether clear when that statute is read in conjunction with General Statutes § 35-44b,[8] which provides that "the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes" when construing the antitrust act. The trial court determined that § 35-44b and our decision in *Vacco* v. *Microsoft Corp.*, 260 Conn. 59, 793 A.2d 1048 (2002), require that the antitrust act be considered

---

[7] General Statutes § 35-38 provides: "In any action instituted by the Attorney General, any individual who has been held to have violated this chapter shall forfeit and pay to the state a civil penalty of not more than twenty-five thousand dollars. Any other person who has been held to have violated any of the provisions of this chapter shall forfeit and pay to the state a civil penalty of not more than two hundred fifty thousand dollars."

[8] General Statutes § 35-44b provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes."

in light of the United States Supreme Court's conclusion that states may not pursue parens patriae actions for damages to their general economies under the federal Clayton Act, 15 U.S.C. § 12 et seq. See *Hawaii* v. *Standard Oil Co. of California*, 405 U.S. 251, 264, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972). The trial court concluded that, because *Standard Oil Co. of California* would preclude the state from pursuing parens patriae actions in federal court under § 35-32 (d) (1) and (2), except on behalf of individuals and direct purchasers, by extension it also would preclude the state from making similar claims in state court under § 35-32 (c) (2).[9] Accordingly, the trial court concluded that the state lacked "standing to assert a claim as parens patriae for damages to the general economy," and dismissed that claim. The trial court then considered the remaining claims in the defendants' motion to strike and denied that motion.[10] This certified interlocutory appeal followed. See footnote 2 of this opinion.

On appeal, the state contends that the trial court improperly concluded that it lacks standing under § 35-32 (c) (2) to pursue a parens patriae claim for damages to its general economy. Specifically, the state argues that the trial court misinterpreted § 35-44b as requiring the complete incorporation of federal law into the state antitrust law. The state relies on our decision in *Miller's Pond Co., LLC* v. *New London*, 273 Conn. 786, 873 A.2d

[9] The trial court reasoned that our decision in *Miller's Pond Co., LLC* v. *New London*, 273 Conn. 786, 808, 873 A.2d 965 (2005), in which we concluded that § 35-44b did not incorporate federal immunity case law doctrines into the antitrust act, was inapposite. The trial court concluded that *Miller's Pond Co., LLC*, was not controlling because it involved state action immunity pursuant to General Statutes § 35-31 (b), which does not have a corresponding federal statutory provision, while the Clayton Act, 15 U.S.C. § 15c, provides a "parallel" parens patriae enforcement statute structured similarly to § 35-32 (c) (2), the statute at issue in the present case.

[10] The defendants also had moved to strike: (1) the claim for injunctive relief under CUTPA; and (2) the common-law claims for breach of fiduciary duty and negligent misrepresentation as barred by the economic loss rule.

965 (2005), and contends that § 35-44b makes federal case law merely persuasive authority in the present case as the relevant state and federal statutes are fundamentally different, because, unlike § 35-32 (c) (2), the Clayton Act, 15 U.S.C. § 15c, does not expressly provide for the availability of general economic damages. The state also contends that it will be able to prove that the damages to its general economy are not duplicative of the defendants' overcharges to their clients, and reasonably may be estimated under the economic principle known as the "multiplier effect."

In response, the defendants contend that the statutory bar against duplicative recovery is consistent with the concerns expressed by the United States Supreme Court in *Hawaii* v. *Standard Oil Co. of California,* supra, 405 U.S. 251, and operates to preclude the state's claim for damages to its general economy because any such damages would be duplicative of those recoverable under subsection (c) (1) of § 35-32. Specifically, the defendants argue that the general economic damages claimed by the state, namely, a diminution of the funds available to circulate throughout the state's economy, are the same as the damages claimed by the affected businesses, namely, moneys that those victims would have been able to invest in different ways. The defendants also contend that denial of standing to pursue general economic damages is consistent with the direct purchaser rule that this state follows in antitrust cases; see *Vacco* v. *Microsoft Corp.,* supra, 260 Conn. 76–77; because those damages similarly are difficult to calculate due to their remote nature, and are not properly measured by the statistical models cited by the state.

"The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determi-

nation] of the motion to dismiss will be de novo. . . .
When a . . . court decides a jurisdictional question
raised by a pretrial motion to dismiss, it must consider
the allegations of the complaint in their most favorable
light. . . . In this regard, a court must take the facts
to be those alleged in the complaint, including those
facts necessarily implied from the allegations, constru-
ing them in a manner most favorable to the pleader.
. . . The motion to dismiss . . . admits all facts which
are well pleaded, invokes the existing record and must
be decided upon that alone." (Citation omitted; internal
quotation marks omitted.) *Cogswell* v. *American Tran-*
*sit Ins. Co.*, 282 Conn. 505, 516, 923 A.2d 638 (2007).

The issue in this case, namely, whether § 35-32 (c)
affords the state parens patriae standing to pursue a
claim for damages to its general economy, raises a ques-
tion of statutory construction, which is a "[question]
of law, over which we exercise plenary review. . . .
The process of statutory interpretation involves the
determination of the meaning of the statutory language
as applied to the facts of the case, including the question
of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objec-
tive is to ascertain and give effect to the apparent intent
of the legislature. . . . In other words, we seek to
determine, in a reasoned manner, the meaning of the
statutory language as applied to the facts of [the] case,
including the question of whether the language actually
does apply. . . . In seeking to determine that meaning,
General Statutes § 1-2z directs us first to consider the
text of the statute itself and its relationship to other
statutes. If, after examining such text and considering
such relationship, the meaning of such text is plain and
unambiguous and does not yield absurd or unworkable
results, extratextual evidence of the meaning of the
statute shall not be considered. . . . The test to deter-
mine ambiguity is whether the statute, when read in

context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 847, 937 A.2d 39 (2008).

We begin, of course, with the language of § 35-32 (c) (2), which permits the attorney general to bring an action in the name of the state as "parens patriae with respect to damages to the general economy of the state or any political subdivision thereof; provided that such damages shall not be duplicative of those recoverable under subdivision (1) of this subsection." Subdivision (1) of subsection (c) permits the attorney general to bring an action as "parens patriae for persons residing in the state with respect to damages sustained by such persons, or, if the court finds in its discretion that the interests of justice so require, as a representative of a class or classes consisting of persons residing in the state who have been damaged . . . ." General Statutes § 35-32 (c) (1). The plain language of § 35-32 (c) (2) read by itself clearly permits the attorney general to bring a parens patriae action for "damages to the general economy of the state," so long as those damages are "not . . . duplicative of those recoverable" under subdivision (1), which are by the state on behalf of "persons residing in the state with respect to damages sustained by such persons," or "as a representative of a class or classes consisting of persons residing in the state who have been damaged . . . ."

In construing § 35-32 (c) (2), however, we also are mindful of the legislature's directive in § 35-44b, which provides: "It is the intent of the General Assembly that in construing sections 35-24 to 35-46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." The defendants contend that § 35-44b requires us to follow the relevant federal case and statutory law, spe-

cifically *Hawaii* v. *Standard Oil Co. of California*, supra, 405 U.S. 263–64, in which the United States Supreme Court concluded, inter alia, that § 4 of the Clayton Act, 15 U.S.C. § 15 (1970),[11] did not permit the state of Hawaii to bring a parens patriae antitrust action for damages to its general economy against numerous petroleum companies because that "would open the door to duplicative recoveries." Noting the complexity of measuring injury to a state's general economy; id., 262–63 n.14; the court reasoned that "[a] large and ultimately indeterminable part of the injury to the 'general economy,' as it is measured by economists, is no more than a reflection of injuries to the 'business or property' of consumers, for which they may recover themselves under § 4 [of the Clayton Act]."[12] Id., 264. Although Congress reacted to *Hawaii* v. *Standard Oil Co. of California*, supra, 251, by enacting the Hart-Scott-Rodino Antitrust Improvements Act of 1976; 90 Stat. 1394 (1976); codified in relevant part at 15 U.S.C. § 15c,[13]

---

[11] Section 4 of the Clayton Act, 15 U.S.C. § 15 (1970) provides: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." See Clayton Act, c. 323, 38 Stat. 731 (1914).

[12] The Supreme Court did, however, conclude that the Clayton Act "permits Hawaii to sue in its proprietary capacity for three times the damages it has suffered from [the defendants'] alleged antitrust violations." *Hawaii* v. *Standard Oil Co. of California*, supra, 405 U.S. 262. The Supreme Court noted that "an injury to the [s]tate in its proprietary capacity . . . affects the citizens in much the same way as an injury of the sort claimed by Hawaii here. Each has the effect of increasing taxes, or reducing government services, or both. But this does not mean that the two kinds of injuries are identical in nature. Where the injury to the [s]tate occurs in its capacity as a consumer in the marketplace, through a payment of money wrongfully induced . . . damages are established by the amount of the overcharge." (Citation omitted; internal quotation marks omitted.) Id., 262–63 n.14.

[13] Section 15c of title 15 of the United States Code provides in relevant part: "(a) Parens patriae; monetary relief; damages; prejudgment interest

"(1) Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in

## to permit state attorneys general to bring parens patriae

such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural persons to their property by reason of any violation of sections 1 to 7 of this title. The court shall exclude from the amount of monetary relief awarded in such action any amount of monetary relief (A) which duplicates amounts which have been awarded for the same injury, or (B) which is properly allocable to (i) natural persons who have excluded their claims pursuant to subsection (b) (2) of this section, and (ii) any business entity.

"(2) The court shall award the State as monetary relief threefold the total damage sustained as described in paragraph (1) of this subsection, and the cost of suit, including a reasonable attorney's fee. The court may award under this paragraph, pursuant to a motion by such State promptly made, simple interest on the total damage for the period beginning on the date of service of such State's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. In determining whether an award of interest under this paragraph for any period is just in the circumstances, the court shall consider only—

"(A) whether such State or the opposing party, or either party's representative, made motions or asserted claims or defenses so lacking in merit as to show that such party or representative acted intentionally for delay or otherwise acted in bad faith;

"(B) whether, in the course of the action involved, such State or the opposing party, or either party's representative, violated any applicable rule, statute, or court order providing for sanctions for dilatory behavior or other wise providing for expeditious proceedings; and

"(C) whether such State or the opposing party, or either party's representative, engaged in conduct primarily for the purpose of delaying the litigation or increasing the cost thereof.

"(b) Notice; exclusion election; final judgment

"(1) In any action brought under subsection (a) (1) of this section, the State attorney general shall, at such times, in such manner, and with such content as the court may direct, cause notice thereof to be given by publication. If the court finds that notice given solely by publication would deny due process of law to any person or persons, the court may direct further notice to such person or persons according to the circumstances of the case.

"(2) Any person on whose behalf an action is brought under subsection (a) (1) of this section may elect to exclude from adjudication the portion of the State claim for monetary relief attributable to him by filing notice of such election with the court within such time as specified in the notice given pursuant to paragraph (1) of this subsection.

"(3) The final judgment in an action under subsection (a) (1) of this section shall be res judicata as to any claim under section 15 of this title

suits in federal court to recover, inter alia, treble damages; see 15 U.S.C. § 15c (a) (2); "on behalf of natural persons residing in such State"; 15 U.S.C. § 15c (a) (1); see *Kansas* v. *Utilicorp United Inc.*, 497 U.S. 199, 218–19, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990); it is undisputed, that even the amended Clayton Act does not provide for damages to the state's general economy in a federal antitrust proceeding.

Our decision in *Miller's Pond Co., LLC*, is, however, illustrative of the purpose and reach of § 35-44b. In that case, we concluded that § 35-44b did not render the state action antitrust immunity provided to municipalities by General Statutes § 35-31 (b)[14] coextensive with the broader grant of immunity available under the line of federal case law starting with *Parker* v. *Brown*, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943).[15] *Miller's*

by any person on behalf of whom such action was brought and who fails to give such notice within the period specified in the notice given pursuant to paragraph (1) of this subsection. . . ."

[14] General Statutes § 35-31 (b) provides: "Nothing contained in this chapter shall apply to those activities of any person when said activity is specifically directed or required by a statute of this state, or of the United States." The immunity available under the statute has been described as a "narrowly drawn version of the doctrine of state action immunity from antitrust liability articulated by the United States Supreme Court in *Parker* v. *Brown*, [317 U.S. 341, 350–51, 63 S. Ct. 307, 87 L. Ed. 315 (1943)]." (Internal quotation marks omitted.) *Miller's Pond Co., LLC* v. *New London*, supra, 273 Conn. 804. "[I]n order to be shielded by qualified state action immunity, the defendant must show that its anti-competitive conduct was specifically directed or required by the government . . . ." (Internal quotation marks omitted.) Id., 806–807.

[15] In *Parker* v. *Brown*, supra, 317 U.S. 351, the Supreme Court concluded that the Sherman Act was not "intended to restrain state action or official action directed by a state." We noted in *Miller's Pond Co., LLC*, that, with respect to municipalities, " '*Parker* immunity does not apply directly to local governments . . . a municipality's restriction of competition may sometimes be an authorized implementation of state policy, and have accorded *Parker* immunity where that is the case.' " *Miller's Pond Co., LLC* v. *New London*, supra, 273 Conn. 801–802, quoting *Columbia* v. *Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 370, 111 S. Ct. 1344, 113 L. Ed. 2d 382 (1991). We observed that "[a] municipality that desires *Parker* immunity must show that, under the state statutory scheme, it has both authority to regulate and

*Pond Co., LLC* v. *New London,* supra, 273 Conn. 808.
We stated that, "although there is legislative history
supporting the defendants' argument that § 35-44b was
intended to 'create one, national body of law,' neither
that history nor the language of the statute as enacted
requires: (1) the repeal of antitrust statutes unique to
our state, without a parallel provision in the federal
scheme; or (2) the overruling of state case law interpre-
ting those statutes that are specific to Connecticut."
Id., 809. Accordingly, we concluded that "§ 35-44b
merely gave legislative imprimatur to what this court
had been doing long before its enactment, namely, look-
ing to case law construing relevant federal statutes as
persuasive authority."[16] Id., 809–10; see also *Westport
Taxi Service, Inc.* v. *Westport Transit District,* 235
Conn. 1, 15–16, 664 A.2d 719 (1995) ("we follow federal
precedent when we interpret the act unless the text
of our antitrust statutes, or other pertinent state law,
requires us to interpret it differently"). Thus, we con-
cluded that "§ 35-44b simply is inapplicable in the pres-

authority to suppress competition." (Internal quotation marks omitted.)
*Miller's Pond Co., LLC* v. *New London,* supra, 802. We stated that the "inquiry
into the municipality's statutory authority to regulate the field in question
has been described as not . . . exacting because whether an ordinance is
actually authorized by state statute suggests that as long as the local enact-
ment is within a broad view of the authority granted by the state, whether
it is actually violative of that statute is a question for state authorities, not
one of federal antitrust law. . . . Moreover, with respect to the municipali-
ty's authority to suppress competition, despite the requirement of a clear
articulation of a state policy to authorize anticompetitive conduct, the statu-
tory authorization need not be explicit; the requirement is met if suppression
of competition is the foreseeable result of what the statute authorizes."
(Citation omitted; internal quotation marks omitted.) Id.

[16] We noted, inter alia, that *Representative Thomas Moukawsher, sponsor*
of the bill that was enacted as § 35-44b, stated that the purpose of the statute
was to enhance Connecticut's attractiveness to business by implementing
" 'a single antitrust jurisprudence in the United States,' " and " 'allow[ing]
[businesses] to look to a single case law jurisprudence, in order to know
whether they're in compliance with our laws or not.' " *Miller's Pond Co.,
LLC* v. *New London,* supra, 273 Conn. 809 n.23, quoting 35 H.R. Proc., Pt.
7, 1992 Sess., p. 2387.

ent case, which concerns a state antitrust statute without federal parallel."[17] *Miller's Pond Co., LLC* v. *New London,* supra, 811.

Thus, we conclude that § 35-44b does not deprive the state of standing to pursue a parens patriae action for antitrust damages to its general economy pursuant to § 35-32 (c) (2) or, put differently, require us to incorporate the federal preclusion of general economy damages into the state antitrust scheme. In concluding otherwise, the trial court improperly relied on *Vacco* v. *Microsoft Corp.,* supra, 260 Conn. 59, and incorrectly characterized § 35-32 (c) as having a federal statutory parallel, namely, 15 U.S.C. § 15c, that requires us to adopt and apply the federal principles as a matter of state law pursuant to § 35-44b. In *Vacco,* we followed the United States Supreme Court decision in *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977), and concluded that the end user licensee of computer software could not maintain an antitrust action under General Statutes § 35-35[18] against a software manufacturer because he was not the direct purchaser of the software at issue. See *Vacco* v. *Microsoft Corp.,* supra, 82–84. *Vacco* is, however, inapposite because it did not involve state statutory language that differs materially from the coordinate federal provision. In contrast, in the present case, although § 35-32 (c),

[17] Moreover, we emphasized that, "[t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or nonaction will have upon any one of them . . . as well as the interpretation which the courts have placed upon one of its legislative enactments and of the effect that its own nonaction, thereafter may have," and we declined to "torture the language of § 35-44b to reach the results, disfavored in our jurisprudence, of overruling past decisions construing § 35-31 (b), or impliedly repealing that same statute." (Citation omitted; internal quotation marks omitted.) *Miller's Pond Co., LLC* v. *New London,* supra, 273 Conn. 812.

[18] General Statutes § 35-35 provides: "The state, or any person, including, but not limited to, a consumer, injured in its business or property by any violation of the provisions of this chapter shall recover treble damages, together with a reasonable attorney's fee and costs."

like the Clayton Act, 15 U.S.C. § 15c, permits the state attorney general to bring a parens patriae action, the statutory parallel turns perpendicular at that point because there is a crucial substantive linguistic difference between the state and federal statutes, namely, the clear authorization for the attorney general under § 35-32 (c) (2) to seek "damages to the [state's] general economy . . . ."[19] This, therefore, renders the present case more analogous to *Miller's Pond Co., LLC*, which similarly presented this court with substantively different state and federal laws. See *Miller's Pond Co., LLC* v. *New London*, supra, 273 Conn. 808–809.

Put differently, the trial court's reading of §§ 35-32 (c) (2) and 35-44b would render the general economy damages provision of § 35-32 (c) (2) superfluous, a result we cannot countenance; see, e.g., *Small* v. *Going Forward, Inc.*, 281 Conn. 417, 424, 915 A.2d 298 (2007); in the absence of statutory language that requires the "wholesale incorporation of federal [antitrust] law" and the repeal of differing state law provisions. *Miller's Pond Co., LLC* v. *New London*, supra, 273 Conn. 809–10 n.24; see id., 812. Thus, we again emphasize that "§ 35-44b do[es] not necessarily counsel blind adherence to

[19] The legislative history of § 35-32 (c) (2), which was enacted as part of Public Acts 1976, No. 76-218, is sparse; see 19 S. Proc., Pt. 4, 1976 Sess., p. 1410, remarks of Senator David H. Neiditz (stating only that bill gives "the [a]ttorney [g]eneral the funds to sue on behalf of the people of the state and to retain some of those funds to create a division in the [a]ttorney [g]eneral's [o]ffice to handle anti-trust matters"); but we note that it was enacted contemporaneously with the federal Hart-Scott-Rodino Antitrust Improvements Act. Indeed, Public Act No. 76-218 also enacted subsection (d) of § 35-32, which provides the attorney general with the authorization to bring a civil action in federal court in the name of the state as parens patriae under the federal antitrust laws. See footnote 1 of this opinion. Scholarly commentators have described Public Act 76-218 as "quite obviously . . . intended to provide the remedy which the United States Supreme Court denied in *Hawaii* [v. *Standard Oil Co. of California*, supra, 405 U.S. 251]." J. Maynes, G. Bramblett & G. Brodigan et al., "Recent History of the Connecticut Antitrust Act," 50 Conn. B.J. 274, 286 (1976).

all things federal." Id., 809–10 n.24. Accordingly, we conclude that § 35-32 (c) (2) confers standing upon the state to pursue a parens patriae claim for antitrust damages to its general economy.

The defendants claim, however, as an alternate ground for affirming the trial court's decision,[20] that the state's claim for general economy damages should be stricken as legally insufficient under § 35-32 (c) (2) because those damages are duplicative of those recoverable pursuant to § 35-32 (c) (1).[21] Specifically, the defendants argue that this statutory bar against the recovery of duplicative damages precludes the state's claim for general economy damages, which is founded on alleged overcharges by the defendants, the damages for which are measured by the difference between the illegal charges and the price that would have been paid in the absence of the antitrust violation. The defendants further claim that these claims, which could have been recoverable under subdivision (1) of § 35-32 (c), have been abandoned by the state in light of earlier settlement agreements in the case between the defendants and certain affected companies. Relying on the rationale behind the direct purchaser rule; see, e.g., *Illinois*

---

[20] As the state concedes, the defendants raised this alternate ground for affirmance properly both before the trial court in their memorandum of law in support of their motion to strike, and in their preliminary statement of the issues pursuant to Practice Book § 63-4. See, e.g., *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 784 n.4, 900 A.2d 18 (2006).

[21] Like a motion to dismiss, "[a] motion to strike challenges the legal sufficiency of a pleading . . . and, consequently, requires no factual findings by the trial court. As a result, our review of the court's ruling is plenary. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . [I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied. . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly . . . rather than narrowly." (Internal quotation marks omitted.) *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 294, 914 A.2d 996 (2007).

*Brick Co.* v. *Illinois*, supra, 431 U.S. 720; as well as the common-law bar against remote and speculative damages, the defendants also reject the state's "multiplier" theory of damages, under which each dollar of an overcharge that actually affected a Connecticut business is alleged to have resulted in more than a dollar's worth of harm to the state's economy. Indeed, the defendants further reject the state's reliance on statistical economic impact analyses to prove the general economy damages, noting that they "[ignore] the central problem" of "disentangl[ing] the overcharges from the alleged harm to the general economy in order to avoid the duplicative recovery that the statute forbids."

In response, the state emphasizes that general economy damages are more than theoretical, and that our legislature, unlike Congress, expressly made them available in parens patriae antitrust actions under § 35-32 (c) (2). The state contends that multiplier damages are not duplicative of the defendants' overcharges because the complaint alleges that many of the payments were made to insurers based outside of Connecticut, thereby removing those funds from the Connecticut economy. Emphasizing its quasi-sovereign interest in the development of its economy, the state further emphasizes that only it, under the plain language of the statute, has standing to seek these damages, as they are too remote to be recovered by individuals under common-law theories. Finally, the state argues that it is inappropriate to conclude that damages are impossible to prove in the context of a motion to strike under which the court must accept as true the facts pleaded, and that the exact amounts of the damages can be determined through discovery and subsequent expert opinion, and the duplication of damages minimized by deducting damages already paid from the state's overall recovery.

Taking all facts pleaded in the complaint as true, we conclude that the state adequately has pleaded a cause

of action for damages to its general economy. Specifically, the state has pleaded that "Connecticut is the home of many insurance companies as well as other large private employers," which have "a substantial impact on the general economy of Connecticut."[22] The state further has alleged that the payments "by Connecticut businesses of the illegal and unfair price increases caused by [the defendants'] bid rigging conspiracy removed mon[eys] from the general economy of Connecticut that otherwise could have and would have been used by companies purchasing excess casualty insurance to invest in the expansion and maintenance of their businesses and products, the purchase of necessary goods and services, and the maintenance and hiring of existing and new employees. This decrease in funds [has] caused less funds to be available to circulate through the general economy of Connecticut for the uses described [previously], caused less economic growth and activity in Connecticut, and thereby damaged the general economy of Connecticut. This damage to Connecticut's general economy is separate and apart from the direct damage companies sustained by payment of [the defendants'] inflated price." Finally, the state had alleged that the increased prices for excess casualty insurance caused by the defendants' bid rigging conspiracy increased the cost of doing business for all companies who had to purchase that insurance, and those costs were "passed on to Connecticut consumers through increased prices for goods and services . . . [that] removed mon[eys] from the general economy of Connecticut that otherwise could have and would have been used by Connecticut consumers to purchase goods and services, and create economic growth and activity in Connecticut."[23]

---

[22] The state further pleads that the insurance industry employs approximately 70,000 of Connecticut's citizens and represents 7 percent of the state's gross product.

[23] Indeed, the state notes that these consumers cannot recover from the defendants because of the direct purchaser rule. See, e.g., *Vacco* v. *Microsoft Corp.*, supra, 260 Conn. 82–84.

In our view, the defendants' arguments with respect to the potentially duplicative nature of the damages and injuries pleaded in the state's complaint implicate potential problems of proof rather than pleading.[24] It is well settled that antitrust injury and damages may be determined by statistical models explained by expert testimony.[25] See *Allapattah Services, Inc.* v. *Exxon Corp.*, 61 F. Sup. 2d 1335, 1347 (S.D. Fla. 1999); *Law* v. *National Collegiate Athletic Assn.*, 5 F. Sup. 2d 921, 930–31 (D. Kan. 1998); see also *Tuscaloosa* v. *Harcros Chemicals, Inc.*, 158 F.3d 548, 566–67 (11th Cir. 1998)

---

[24] The defendants argue that the state's complaint actually alleges an *increase* in the spending of the state's general economy, as its allegations boil down to the fact that policyholders had to pay more money to insurance companies and large private employers based here, and that the insurance companies actually profited from the defendants' bid rigging scheme. The defendants then use the state's multiplier theory to show that this increased spending resulted in insurance companies hiring more employees and spending more money, thus aiding the general economy. Again, this argument appears to be more of an attack on the state's proof, and is not, therefore, well taken at this point as the complaint clearly alleges damages to the general economy that go beyond those occasioned by insurance companies.

[25] Our research indicates that two other states, Nevada and Virginia, have statutes that permit expressly such "general economy" damages claims; see Nev. Rev. Stat. § 598A.160 (1) (2007) ("[t]he Attorney General may bring a civil action for any violation of the provisions of this chapter in the name of the State of Nevada and is entitled to recover damages and secure other relief provided by the provisions of this chapter . . . [b] [a]s parens patriae, with respect to direct or indirect damages to the general economy of the State of Nevada or any political subdivision thereof"); Va. Code Ann. § 59.1-9.15 (d) (2006) ("[t]he Attorney General may bring a civil action to recover damages and secure other relief as provided by this chapter as parens patriae respecting injury to the general economy of the Commonwealth"). Indeed, Nevada specifically envisions the use of statistical evidence to prove such damages, as its statute, which like Connecticut's was enacted in the wake of *Hawaii* v. *Standard Oil Co. of California*, supra, 405 U.S. 251, specifically provides that the state may prove such damages via "[s]tatistical or sampling methods"; Nev. Rev. Stat. § 598A.160 (2) (a) (1) (2007); or "such other reasonable system of estimating aggregate damages as the court may permit"; Nev. Rev. Stat. § 598A.160 (2) (a) (3) (2007); in permitting it to "recover the aggregate damage sustained by the persons on whose behalf this State sues, without separately proving the individual claims of each such person. . . ." Nev. Rev. Stat. § 598A.160 (2) (a) (2007).

(statistician's testimony is admissible as circumstantial evidence to indicate collusive behavior in state's chlorine marketplace), cert. denied, 528 U.S. 812, 120 S. Ct. 309, 145 L. Ed. 2d 42 (1999). Thus, although the defendants ultimately may be correct that the state's economic models are unable to separate its claimed general economy damages from those recoverable under § 35-32 (c) (1),[26] it nevertheless would be premature for us to make that determination on the pleadings alone before any discovery has been conducted. Further proceedings surely will lead to a more reasoned evaluation of whatever statistical methodologies are ultimately proffered by the state's expert witnesses during discovery and at trial. See *Lorix* v. *Crompton Corp.*, 736 N.W.2d 619, 633 (Minn. 2007) (declining to "accept, in the context of a motion to dismiss, [the defendant's] assertion that [the plaintiff's] damages are so speculative as to render proof impossible"); see also *Temple* v. *Circuit City Stores, Inc.*, Docket No. 06 CV 5303, 2007 U.S. Dist. LEXIS 70747, *17–18 (E.D.N.Y. September 25, 2007) ("[W]hile the defendants are correct that proof of damages in this case will be difficult, they have not convinced me that any evidence of damages will be insufficient as a matter of law. After all, antitrust plaintiffs need not prove damages with exactitude at any stage, much less in the pleadings."); *D.R. Ward Construction Co.* v. *Rohm & Haas Co.*, 470 F. Sup. 2d 485, 504 (E.D. Pa. 2006) (refusing "to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge

---

[26] Moreover, the legislature's adoption of § 35-32 (c) (2), despite the United States Supreme Court's explanation in *Hawaii* v. *Standard Oil Co. of California*, supra, 405 U.S. 262–63 n.14, of the difficulty of calculating general economy damages and the potential for duplicative recoveries, indicates the legislature's confidence, which we share, "in the ability of our . . . courts to manage difficult cases." *Lorix* v. *Crompton Corp.*, 736 N.W.2d 619, 634–35 (Minn. 2007) (permitting indirect purchaser claim to go forward notwithstanding "formidable complexities of proof").

suffered by the . . . plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert testimony"). Accordingly, we conclude that the state's complaint seeking damages to its general economy under § 35-32 (c) (2) need not be stricken as legally insufficient.

The decision is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.