The appeal is dismissed.

In this opinion the other judges concurred.

ED CONSTRUCTION, INC. *v.* CNA INSURANCE
COMPANY ET AL.
(AC 31476)

Lavine, Beach and Robinson, Js.

Argued March 21—officially released July 26, 2011

*Robert J. Sciglimpaglia, Jr.*, for the appellant (plaintiff).

*Sean M. Nourie*, for the appellee (named defendant).

*Marisa F. Schafer*, with whom, on the brief, was *James T. Baldwin*, for the appellee (defendant Ramiro Rodriguez).

*Opinion*

LAVINE, J. The plaintiff, ED Construction, Inc., appeals from the judgment of the trial court, rendered after a trial to the court, denying its claim for a declaratory judgment against the defendants, CNA Insurance Company (CNA) and Ramiro Rodriguez. The plaintiff sought a declaratory judgment concerning the interpretation of a workers' compensation insurance policy (policy) that it purchased from CNA.[1] On appeal, the plaintiff makes a number of claims concerning the

---

[1] The plaintiff also sought payment of all past attorney's fees and costs expended in defending a workers' compensation claim initiated by Rodriguez.

court's judgment.[2] These claims fairly can be summarized as follows: (1) the court improperly determined that the policy permitted CNA to calculate and collect the final premium prior to the end of the policy period and that CNA could cancel the policy so long as it provided notice to the plaintiff at least ten days prior to the date of cancellation, (2) the court made an erroneous factual finding when it concluded that CNA did not breach the insurance policy and (3) the court erred in determining that CNA properly responded to the plaintiff's March 3, 2003 letter concerning the increased premium and that the plaintiff failed to appeal the premium increase and the audit of its policy by CNA. We disagree with the plaintiff, and, accordingly, affirm the judgment of the trial court.

The following facts were stipulated to by the parties and accepted by the court. Ed Devingo is the owner and president of the plaintiff. On August 26, 2002, Devingo met with Diane H. Silfen of the Haehl Agency, Inc., for the purpose of applying for workers' compensation insurance coverage for the plaintiff through the assigned risk market.[3] During this meeting, Devingo and

---

[2] The plaintiff enumerates thirteen issues under seven separate headings in its brief to this court. "This court often has noted that such a multiplicity of issues can foreclose the appellant's opportunity to provide a fully reasoned discussion of the pivotal issues on appeal. . . . As our Supreme Court has observed: Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases." (Citation omitted; internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 280 n.4, 976 A.2d 750 (2009). "Multiplicity hints at lack of confidence in any one [issue] . . . . [M]ultiplying assignments of error will dilute and weaken a good case and will not save a bad one. . . . Most cases present only one, two, or three significant questions. . . . Usually . . . if you cannot win on a few major points, the others are not likely to help. . . . The effect of adding weak arguments will be to dilute the force of the stronger ones." (Internal quotation marks omitted.) *Southington* v. *Commercial Union Ins. Co.*, 71 Conn. App. 715, 740 n.14, 805 A.2d 76 (2002).

[3] Employers who are unable to obtain workers' compensation insurance coverage through the voluntary insurance market must apply for coverage through the assigned risk market.

Silfen completed and signed an "ACORD 130 worker's compensation application form" and "ACORD 133 worker's compensation insurance plan/assigned risk section form." Devingo indicated on the application that the plaintiff had one employee and that it provided carpentry services. Silfen estimated the premium for the plaintiff's policy to be $750, which was immediately paid by the plaintiff.

The National Council on Compensation Insurance, Inc. (council),[4] assigned coverage of the plaintiff to CNA via a randomized assignment process from a pool of participating insurance companies. On September 20, 2002, the council issued a workers' compensation and employer's liability policy binder to the plaintiff, which had an effective date of August 27, 2002.

On October 28, 2002, after the policy period had commenced, CNA requested a detailed list of the plaintiff's business operations and current certificates of insurance for all of its subcontractors. On December 18, 2002, CNA ordered a preliminary audit of the plaintiff's policy because the plaintiff's certificates of insurance failed to indicate current workers' compensation coverage for the listed subcontractors and because the plaintiff submitted "forms for exclusion of coverage by workers' compensation law" for individuals who appeared to be employees. On January 6, 2003, the preliminary audit was assigned to Suzanne Delvento, an employee in CNA's audit department. On February 10, 2003, Delvento completed the audit survey and found that all of the workers whom the plaintiff had paid during the policy period had signed a sole proprietor exclusion form and were all carrying only general liability insurance. Delvento also found that the plaintiff performed roofing services rather than carpentry services.

---

[4] The council is the plan administrator for the Connecticut workers' compensation insurance plan.

On February 15, 2003, Delvento completed a premium audit analyst notification, which noted that the plaintiff's estimated exposure of $1500 within the carpentry class was incorrect. The plaintiff's exposure was increased to $114,802 pursuant to the roofing rate class. CNA also notified the plaintiff that its payroll was underestimated on its application and that the premium now reflected the new annualized payroll.[5] On February 21, 2003, CNA issued a bill to the Haehl Agency, Inc., that reflected a premium due of $51,718 by March 23, 2003.

On March 3, 2003, Silfen faxed a letter to CNA, stating that "[t]his letter is to appeal the enclosed $51,718 bill. The insured has no employees at all, how can he have a payroll of $114,802?" Stephanie Spellman, one of CNA's employees, responded to Silfen's letter on March 10, 2003, and explained the procedures that needed to be followed in order to place the audit in dispute. Specifically, Spellman wrote to Silfen that "[i]f insured wishes to dispute they need to provide proper documentation to show subs are independent. They need to fax [documentation] to audit dispute unit . . . ." She further stated that if "audit put in dispute, then billing will be suspended."

On March 27, 2003, CNA issued a notice of cancellation for nonpayment of premium and notified the plaintiff that the policy cancellation would take effect on April 11, 2003, and that the plaintiff still owed the additional premium of $51,718. CNA did not receive any additional payments from the plaintiff and cancelled the policy on April 11, 2003. On June 13, 2003, CNA received a letter from Robert Vogler on behalf of the plaintiff, disputing the audit and requesting an abatement of the additional audit billing. On June 14, 2003,

---

[5] CNA used the remuneration the plaintiff paid to Rodriguez and three other individuals, among other factors, to recalculate the annual estimated premium.

Rodriguez sustained "catastrophic injuries" while performing roofing services on behalf of the plaintiff and filed a claim for workers' compensation benefits.[6]

During the pendency of Rodriguez' claim, on January 23, 2006, the plaintiff initiated this action, seeking a judgment declaring that the policy covered the injuries sustained by Rodriguez, and that CNA either defend the plaintiff against Rodriguez' claim or pay the plaintiff for all future costs and attorney's fees in defending itself against the claim and award payment to the plaintiff for any costs and attorney's fees already expended in defending itself against the claim. In its memorandum of decision, the court addressed the plaintiff's complaint in three parts.

In part one, the court noted that "[t]he gravamen of this action is whether the insurance policy entered into between the plaintiff and [CNA] was in effect at the time of the alleged injury such that coverage was mandatory." The court concluded that the unambiguous language of the policy contemplates cancellation of the contract by either party prior to the end of the policy term. The court further concluded that pursuant to part five of the policy, the plaintiff was required to pay all premiums when due and that CNA properly could increase the premium prior to the completion of the policy period.

---

[6] Rodriguez subsequently filed a workers' compensation claim alleging that he was an employee of the plaintiff at the time of his injuries. Over the course of two years, the workers' compensation commissioner (commissioner) held nine formal hearings concerning Rodriguez' claim. *Rodriguez v. E.D. Construction, Inc.*, 126 Conn. App. 717, 719, 12 A.3d 603, cert. denied, 301 Conn. 904, 17 A.3d 1046 (2011). On January 10, 2008, the commissioner dismissed Rodriguez' claim because Rodriguez was not the plaintiff's employee but rather a subcontractor. Id., 722, 724. On May 11, 2009, the workers' compensation review board (board) issued a memorandum of decision affirming the commissioner's dismissal of Rodriguez' claim. Id., 724. Rodriguez appealed the board's decision to this court, which affirmed the dismissal of his claim. Id., 733.

In the second part of its decision, the court addressed the plaintiff's claim that CNA failed to act on its appeal regarding the increased premium pursuant to the policy. The court noted that the plaintiff sent CNA a letter in response to the premium increase resulting from the audit. The court, however, also noted that CNA explained to the plaintiff the procedures that needed to be followed in order to place the audit in dispute but that the plaintiff did not even attempt to comply with those procedures.[7]

Finally, the court addressed the plaintiff's claim that public policy dictates that cancellation of an assigned risk workers' compensation policy during the period of the policy defies the humanitarian purposes of the Workers' Compensation Act (act), General Statutes § 31-275 et seq.[8] The court concluded that CNA was entitled to cancel the policy for nonpayment of premium under both the policy's terms and council guidelines. The court also noted that the plaintiff did not cite any authority supporting its claims that the humanitarian purpose of the act prohibits cancellation.

Accordingly, the court concluded that CNA properly cancelled the plaintiff's insurance policy prior to the events of June 14, 2003, the day on which Rodriguez sustained catastrophic injuries, and, therefore, that

---

[7] Specifically, the court concluded: "[CNA] provided the plaintiff with information apprising it of the necessary procedure to put the audit in dispute and suspend the billing until the appeal occurred. . . . The plaintiff makes no argument that it even attempted to follow the audit dispute procedure that was incorporated within the CNA letter. Instead, the plaintiff waited until June 13, 2003, more than three months later, to respond to the March 10, 2003 letter. . . . Even then, the plaintiff did not dispute the audit by the means instructed in the March 10, 2003 letter." (Citations omitted.)

[8] Our courts consistently have concluded that the act "is a remedial statute that should be construed generously to accomplish its purpose. . . . The humanitarian and remedial purposes of the act counsel against an overly narrow construction that unduly limits eligibility for workers' compensation." (Internal quotation marks omitted.) *DiNuzzo* v. *Dan Perkins Chevrolet Geo, Inc.*, 294 Conn. 132, 150, 982 A.2d 157 (2009).

CNA was under no obligation to defend the plaintiff against Rodriguez' claim or pay for any expenses incurred by the plaintiff in defending itself against the claim. This appeal followed.

Practice Book § 17-55 provides: "A declaratory judgment action may be maintained if all of the following conditions have been met: (1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; (2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and (3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

"The purpose of a declaratory judgment action, as authorized by General Statutes § 52-29 and Practice Book § [17-55], is to secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties. . . . [D]eclaratory relief is a mere procedural device by which various types of substantive claims may be vindicated. . . .

"Implicit in these principles is the notion that a declaratory judgment action must rest on some cause of action that would be cognizable in a nondeclaratory suit. . . . To hold otherwise would convert our declaratory judgment statute and rules into a convenient route for procuring an advisory opinion on moot or abstract questions . . . and would mean that the declaratory judgment statute and rules created substantive rights

that did not otherwise exist." (Citations omitted; internal quotation marks omitted.) *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 756–57, 6 A.3d 726 (2010).

I

The plaintiff first claims that the court improperly determined that (1) the policy could be cancelled so long as notice was provided to the plaintiff at least ten days prior to the date of cancellation, and (2) the final premium for the policy could be calculated and made due prior to the end of the policy period. We disagree.

The following portions of the policy are relevant to our resolution of the plaintiff's claim. Part five of the policy, which relates to premiums, provides:

"B. [Classifications:] Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy. . . .

"D. [Premium Payments:] You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.[9]

"E. [Final Premium:] . . . The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. . . . If policy is canceled, final premium will be determined in the following way unless

---

[9] Section D was amended by endorsement to include the following: "The due date for audit and retrospective premiums is the date of the billing."

our manuals provide otherwise: 1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium. . . .

"G. [Audit:] You will let us examine and audit all your records that relate to this policy. . . . We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium."

Section D of part six of the policy provides: "Cancelation . . . 2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancelation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice."

"[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo." (Internal quotation marks omitted.) *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, 267 Conn. 512, 519, 838 A.2d 993 (2004). More specifically, "[t]he [i]nterpretation of an insurance policy, like the interpretation of other written contracts, involves a determination of the intent of the parties as expressed by the language of the policy. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . It is axiomatic that a contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy. . . . The policy words must be accorded their natural and ordinary meaning . . . [and] any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the

insurance company drafted the policy. . . . A necessary predicate to this rule of construction, however, is a determination that the terms of the insurance policy are indeed ambiguous. . . . The fact that the parties advocate different meanings of the [insurance policy] does not necessitate a conclusion that the language is ambiguous. . . . Moreover, [t]he provisions of the policy issued by the defendant cannot be construed in a vacuum. . . . They should be construed from the perspective of a reasonable layperson in the position of the purchaser of the policy." (Internal quotation marks omitted.) *Community Renewal Team, Inc.* v. *United States Liability Ins. Co.*, 128 Conn. App. 174, 178, 17 A.3d 88, cert. denied, 301 Conn. 918, 21 A.3d 463 (2011).

The plaintiff first claims that the court improperly determined that the policy could be cancelled so long as notice was provided to the plaintiff at least ten days prior to the date of cancellation. We disagree and conclude that the language of part six, § D, of the policy is unambiguous and permits cancellation of the policy by CNA at any time so long as it provides "not less than ten days advance written notice stating when the cancelation is to take effect."

In its brief to this court, the plaintiff notes that part six of the policy contains a conformity clause. This clause provides: "Any of these provisions that conflict with a law that controls the cancelation of the insurance in this policy is changed by this statement to comply with the law." The plaintiff also cites the Connecticut workers' compensation insurance plan (plan) applicable to assigned risk policies.[10] Section III, part two, of the plan provides: "If, after the issuance of a policy, the assigned carrier determines that an employer is not entitled to insurance, or has failed to comply with

---

[10] Assigned risk insurance policies that are issued in Connecticut are governed by, among other things, the plan.

reasonable health, safety, and loss control require-
ments, or has violated any of the terms and conditions
under which the insurance was issued, and after provid-
ing opportunity for cure, the assigned carrier shall initi-
ate cancellation . . . ." Finally, the plaintiff also cites
the conformity clause of part one of the policy, which
provides in relevant part: "Terms of this insurance that
conflict with the workers compensation law are
changed by this statement to conform to that law."

With reference to these provisions, the plaintiff baldly
asserts that "[c]learly, the trial judge erred in ruling that
cancellation by the insurer by simply providing ten day
notice in this matter was incorrect" and that insurer
cancellation based on nonpayment of a premium is in
violation of the clear policy language. We conclude,
however, that the court did not err in interpreting the
policy. As noted, the unambiguous language of the pol-
icy allows for the cancellation of the policy by CNA so
long as notice is provided to the plaintiff ten days prior
to the date of cancellation. The plaintiff has not pro-
vided us with any provisions of the policy or any cases
that suggest there are any limitations, other than the
notice requirement, on when or under what circum-
stances the policy can be cancelled by CNA. Also,
although the plaintiff cites the conformity clauses of
parts one and six of the policy, it does not identify any
laws that conflict with the provisions of the policy or
the plan that would require the cancellation provisions
of the policy to be modified.

The plaintiff alternatively argues that because cancel-
lation of the policy violated the humanitarian purpose
of our act the court improperly concluded that CNA
could cancel the policy. Specifically, the plaintiff claims
that "[g]iven the humanitarian purpose of the workers'
compensation system and the assigned risk program,
it only makes sense, and good public policy, to require
premium adjustments to be done after a policy ends so

not to interrupt coverage in the event of an injury due to the nonpayment of a premium within the policy term." We are not persuaded.

The plaintiff does not cite any authority that supports the proposition that the cancellation of an insurance policy during the policy period, as provided in the policy, violates the humanitarian purposes of the act. The only case cited by the plaintiff concerning this claim provides the well recognized standard that courts should interpret the act broadly to accomplish its humanitarian purpose; see *Suprenant* v. *New Britain*, 28 Conn. App. 754, 759, 611 A.2d 941 (1992); a proposition with which we fully agree.

Additionally, to conclude that the cancellation of a policy would violate the humanitarian purposes of the act would contradict the act's own language, which contemplates the cancellation of insurance policies. See, e.g., General Statutes § 31-348 ("[t]he cancellation of any policy so written and reported shall not become effective until fifteen days after notice of such cancellation has been filed with the chairman [of the workers' compensation commission]"). Accordingly, we conclude that the court's conclusion that the policy could be cancelled is not at odds with the humanitarian purposes of the act.[11]

The plaintiff next claims that the court improperly concluded that the final premium for the policy could be calculated and made due prior to the end of the policy period. Specifically, the plaintiff argues that pursuant to

---

[11] The plaintiff also claims that CNA "clearly intended to cancel the plaintiff's coverage once it received [a] claim from Jesus Hernandez, and, thus, wrongfully instituted the audit procedure to effectuate cancellation." This claim is unsupported by the facts. CNA contracted with Travelers Insurance Company (Travelers) to service the policy. On December 18, 2002, CNA ordered the audit of the plaintiff's policy; however, it was not until January 7, 2003, that counsel for the plaintiff notified Travelers that Hernandez had sustained an injury while performing roofing services for the plaintiff.

part five, § E, the final premium could not be determined until after the policy ended by using the actual, not the estimated, premium basis and the proper classifications.

We conclude that, although the policy indicates that final premiums will be determined after the policy ends, it nonetheless contemplates changes in the premium during the policy period. We also agree with the court's conclusion that the policy permits the collection of the increased premium during the policy period. As noted, part five, § B, of the policy provides that the business or work classifications for the policy were assigned based on an estimate of the exposures the plaintiff would have during the policy period. It further provides that if actual exposures are not properly described by those classifications, CNA will assign proper classifications, rates and premium basis by endorsement to the policy. The policy, therefore, permits a change in premium during the policy period if the exposures of the insured are not accurately estimated when the initial premium amount is calculated.

Finally, part five, § D, unambiguously requires payment of a premium when it is due. This section also was amended via endorsement to provide that the due date for audit and retrospective premiums is the date of the billing. We conclude, therefore, that the policy permits the collection of an increased premium during the policy period.[12]

## II

The plaintiff next claims that the court made an erroneous factual finding when it concluded that CNA did

---

[12] The plaintiff further claims that the court improperly concluded that part five, § D, of the policy applies to part five, §§ E and G. As noted, part five, § E, concerns final premiums, and part five, § G, concerns audits. We, however, already have concluded that CNA properly increased the premium pursuant to part five, § B, and, therefore, the plaintiff was obligated to pay the new premium by the due date. Accordingly, we need not decide whether part five, § D, applies to part five, §§ E and G.

not breach the insurance policy. We again disagree with the plaintiff.

"Whether there was a breach of contract is ordinarily a question of fact. . . . We review the court's findings of fact under the clearly erroneous standard. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Internal quotation marks omitted.) *Aaron Manor, Inc.* v. *Irving*, 126 Conn. App. 646, 653, 12 A.3d 584, cert. granted on other grounds, 301 Conn. 908, 19 A.3d 178 (2011).

The plaintiff argues that the court's conclusion that CNA did not breach the policy was clearly erroneous because, in reaching this conclusion, the court relied on the assigned risk supplement (supplement) rather than the language of the policy itself. We conclude that the plaintiff's claim is without merit and that the court properly determined that CNA did not breach the policy.

We previously concluded in part I of this opinion that part six, § D, of the policy permitted CNA to cancel the policy so long as it provided the plaintiff with notice at least ten days prior to the date of cancellation. We also concluded that, pursuant to part five, §§ B and D, of the policy, CNA was permitted to assign proper classifications, rates and premium basis by endorsement to the policy and collect an increased premium during the policy period.

As noted, CNA issued a notice of cancellation for nonpayment of premium on March 27, 2003, and notified

the plaintiff that the policy cancellation would take effect on April 11, 2003. CNA did not receive any additional payments from the plaintiff concerning the increased premium and cancelled the policy on April 11, 2003.

As to the premium increase, Devingo indicated in the plaintiff's policy application that the plaintiff engaged in the business of providing carpentry services and only had one employee. CNA later completed a premium audit, which noted that the plaintiff's estimated exposure within the carpentry rate class was incorrect, and adjusted the plaintiff's premium to include exposure as paid with the roofing class. The audit also revealed that the plaintiff had more than one employee and that its previous annualized payroll was incorrect. CNA then issued a bill that reflected an endorsement to the policy resulting in an additional premium due of $51,718 by March 23, 2003.

These facts were stipulated to by the parties and accepted by the court. Also, the policy, the supplement, the results of the audit and the notice of cancellation were admitted as exhibits at trial, as well as the bill for the increased premium. We conclude, therefore, that there was evidence in the record that supported the court's conclusion that CNA could properly increase the policy premium during the policy period and could properly collect the premium during the policy period. There also was evidence in the record that CNA complied with the cancellation provisions of the policy before cancelling the policy on April 11, 2003. Accordingly, the court's finding that CNA did not breach the policy was not clearly erroneous.

III

In its final claim, the plaintiff argues that the court erred in determining that CNA properly responded to

its March 3, 2003 letter concerning the increased premium and that the plaintiff failed to appeal the premium increase and the audit under the policy. We note that the court never made a finding as to whether the plaintiff appealed the premium increase; therefore, we will only address the plaintiff's claim as it relates to the appeal of the audit. In doing so, we conclude that the court's findings that CNA properly acted upon the plaintiff's March 3, 2003 letter and that the plaintiff failed to initiate the audit dispute procedure were not clearly erroneous.

Our review of the audit dispute procedures under the policy is de novo. See *Galgano* v. *Metropolitan Property & Casualty Ins. Co.*, supra, 267 Conn. 519. Our review of whether CNA properly complied with the audit dispute procedure and whether the plaintiff initiated the dispute procedure, however, is a question of fact and falls under the clearly erroneous standard of review. See *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 322, 991 A.2d 666 (degree of compliance by parties to contract is question of fact), cert. denied, 297 Conn. 906, 995 A.2d 634 (2010). As noted "[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . ." (Internal quotation marks omitted.) *Aaron Manor, Inc.* v. *Irving*, supra, 126 Conn. App. 653.

At trial, the plaintiff argued that CNA failed to act on the plaintiff's appeal regarding the increase in premium. The court was not persuaded by this claim and concluded that CNA "provided the plaintiff with information apprising it of the necessary procedure to put the audit in dispute and suspend the billing until the appeal occurred. . . . The plaintiff makes no argument that it even attempted to follow the audit dispute procedure that was incorporated within the CNA letter." (Citation omitted.)

The policy does not contain any provisions relating to disputes concerning the audit procedure. The supplement, which, along with the plan, governs the policy, does provide, however, that "[i]f an insured disputes an audit, the carrier shall contact the insured and resolve issues concerning the accuracy of the audit within forty-five (45) days from the date of receipt of written notice of the dispute. The dispute should be concluded either by revising the audit billing, or by written notice to the insured that the original audit is accurate."

We conclude that there was sufficient evidence in the record to support the court's conclusion that CNA responded sufficiently to the plaintiff's letter. We also conclude that there was sufficient evidence in the record to support the court's conclusion that the plaintiff did not properly dispute the audit. As noted, on March 3, 2003, Silfen faxed a letter to CNA on behalf of the plaintiff, stating that "[t]his letter is to appeal the enclosed $51,718 bill. The insured has no employees at all, how can he have a payroll of $114,802?" Spellman responded to Silfen's letter on March 10, 2003, and stated that "[i]f insured wishes to dispute they need to provide proper documentation to show subs are independent. They need to fax [documentation] to audit dispute unit . . . ." Spellman further stated that if "audit put in dispute, then billing will be suspended." These facts were stipulated to by the parties and presented to the court, and Silfen's letter to CNA and Spellman's response were entered as an exhibit at trial.

Spellman responded to the plaintiff's letter within seven days of receiving it, providing the plaintiff with instructions on how to put the audit in dispute. Spellman also included her telephone number in her response and directed the plaintiff to contact her if it had any questions. The plaintiff stipulated to the fact that it took no further action in regard to the audit until June 13, 2003, after the policy had been cancelled.

Although the supplement provides that CNA must resolve issues concerning the accuracy of the audit within forty-five days from the date of receipt of written notice, "the general rule with respect to compliance with contract terms . . . is not one of strict compliance, but substantial compliance." (Internal quotation marks omitted.) *Pack 2000, Inc.* v. *Cushman*, 126 Conn. App. 339, 348–49, 11 A.3d 181, cert. granted on other grounds, 301 Conn. 907, 19 A.3d 177 (2011). CNA did initiate the process to resolve the plaintiff's issue concerning the audit; however, the plaintiff made no attempt to comply with CNA's request for supporting documentation and did not take any further action concerning the audit until *after* the policy was cancelled. Furthermore, the supplement requires that the plaintiff cooperate fully with CNA and provide all information requested by CNA for auditing and underwriting purposes. The plaintiff did not cooperate with CNA's request for information and cannot now claim that it properly disputed the audit when it ignored CNA's explicit instructions on how to initiate the dispute procedure and suspend billing.[13]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[13] The plaintiff makes a separate claim that the court "committed plain error by holding that [CNA] was justified in charging Ramiro Rodriguez' remuneration as an employee as part of the $51,000 premium adjustment and then using that premium adjustment as a basis to cancel the policy . . . ." We note that the court never made such a finding as to what remuneration CNA was justified in charging. We, therefore, construe this claim as a challenge of the court's conclusion that "[t]he audit recalculated premium based on a determination of employees entitled to coverage, as opposed to excluded independent contractors as the plaintiff has claimed, was therefore permissible."

The plaintiff argues under this section that it had the right to appeal CNA's decision that Rodriguez was an employee and subsequent decision to increase the premium based on the results of the audit. Pursuant to the policy, the plaintiff did have a right to challenge the results of the audit; however, as we already have concluded, it failed to properly place the audit in dispute.