# COMPASSIONATE CARE, INC. *v.* THE TRAVELERS INDEMNITY COMPANY
## (AC 34963)

DiPentima, C. J., and Robinson and Bishop, Js.

Argued September 16—officially released December 31, 2013

*Thomas W. Bucci,* for the appellant (plaintiff).

*Paul Stoughton,* with whom, on the brief, was *Sean M. Nourie,* for the appellee (defendant).

*Opinion*

BISHOP, J. The plaintiff, Compassionate Care, Inc., appeals from the judgment of the trial court rendered in favor of the defendant, The Travelers Indemnity Company. The plaintiff filed a two count complaint in which it sought, as to the first count, a declaratory judgment

that the defendant is legally obligated to provide the plaintiff with a workers' compensation insurance policy for an estimated annual premium of $1069 and that the plaintiff is not responsible for paying an increased premium of $103,813, as assessed by the defendant. In its second count, the plaintiff sought monetary damages for the defendant's alleged breach of the covenant of good faith and fair dealing. In response, the defendant filed a two count amended counterclaim sounding in breach of contract based on, inter alia, the plaintiff's alleged failure to pay the premium ultimately claimed by the defendant and requesting the dismissal of the plaintiff's complaint, damages and other relief. The court found for the defendant on the plaintiff's complaint and for the defendant on its counterclaim. On appeal, the plaintiff claims that the trial court incorrectly found that: (1) with respect to the first count of its complaint (A) the health care professionals (HCPs)[1] who contracted with the plaintiff were its employees, and not independent contractors; (B) the plaintiff would be responsible for providing workers' compensation benefits to the HCPs pursuant to General Statutes § 31-292; and (2) the defendant had a contractual right to charge the plaintiff a higher policy premium based on the classification of the HCPs as employees and on its potential liability to provide workers' compensation insurance for the HCPs. We conclude that the court incorrectly determined that the HCPs were the plaintiff's employees and that, as such, the plaintiff would be responsible for providing workers' compensation benefits under § 31-292. Nonetheless, we conclude that the defendant had the contractual right to charge the plaintiff a higher premium based on its risk exposure to provide workers' compensation coverage for the HCPs. Accordingly, we reverse the judgment of the trial court

---

[1] We use the acronym HCPs for purposes of clarity and consistency as this terminology was used at trial.

as to the first count of the plaintiff's complaint, and we affirm the judgment of the trial court with respect to the second count of the plaintiff's complaint and the defendant's counterclaim.

The following undisputed facts, as gleaned from the record, are relevant to our discussion of the issues on appeal. The plaintiff is in the business of making referrals of HCPs, including registered nurses and nurse's assistants, to private individuals and organizations such as nursing homes. The HCPs, who must be properly licensed, submit applications to the plaintiff for the purpose of becoming part of the plaintiff's referral list. As part of the application process, the HCPs are subject to background checks and are also required to complete a "Pre-employment Physical Examination" form. Based on the requests it receives from client health care facilities, the plaintiff offers assignments to the HCPs, who are free to accept or reject the offered position without penalty. The plaintiff does not own, operate, or manage any of the third-party entities to which the HCPs are assigned. Although the HCPs contract with the plaintiff, they are free to work for other agencies or entities while remaining on the plaintiff's referral list. Once they are put on the plaintiff's referral list, however, the HCPs are not allowed to accept employment positions directly from the plaintiff's client companies. Similarly, and by agreement with the plaintiff, its client companies are also prohibited from directly hiring any HCP who is on the plaintiff's referral list unless it informs the plaintiff, in writing, ninety days in advance of its intent to employ an HCP. If a client fails to notify the plaintiff in advance of hiring an HCP directly, the client must pay the plaintiff liquidated damages as delineated in its contract with the plaintiff.

After an HCP has accepted a work placement referral from the plaintiff, the HCP is responsible for completing time sheets to record the hours he or she has worked for

a client company. The time sheets are then submitted by the HCPs to the plaintiff, which then bills the third-party clients based on the reported hours worked and an hourly rate previously agreed upon by the plaintiff and third-party client. The hourly rate is actually an amount greater than the fee paid to an HCP because the rate includes a fee paid to the plaintiff by the client company for its services in referring an HCP to a client company. The plaintiff then pays the HCP directly, based on the hourly rate set by the client company and the plaintiff and agreed to by the HCP. The plaintiff does not withhold any taxes from the payment made to the HCP. At the end of each calendar year, the plaintiff issues a 1099 tax form to each HCP who provided services to a client company pursuant to this arrangement during the calendar year.[2]

Significantly, the plaintiff has no role in supervising or evaluating the work performed by the HCPs. Nor did the court receive any evidence that the agreements made between the plaintiff and HCPs or the agreements between the plaintiff and client companies contained any provisions authorizing the plaintiff to supervise or direct the manner in which an HCP performs services to a client company. Rather, the plaintiff, at the beginning of each work assignment, informs the HCP of the specific requirements of the assignment, based on information received by the plaintiff from a client company, and informs the HCP of the hourly rate he or she will receive based on the determination of the plaintiff and

---

[2] Federal 1099 tax forms are generally used to report payments made in the course of a business to a person who is not an employee; See *Rodriguez* v. *E.D. Construction, Inc.*, 126 Conn. App. 717, 729, 12 A.3d 603 ("[o]ther persuasive factors that a person is holding oneself out to be an independent contractor include the issuance of 1099 federal tax forms"), cert. denied, 301 Conn. 904, 17 A.3d 1046 (2011); as distinguished from W-2 tax forms, which are used to report wages, tips, and other compensation paid to an employee.

the client company.[3] The record does reflect, however, that although the plaintiff plays no role in supervising the manner in which an HCP performs his or her services, the plaintiff does retain the right to remove an HCP from an assignment if the third-party client so requests. Reciprocally, the HCP also has the ability to terminate his or her relationship with the plaintiff at any time.

In 2006, the plaintiff attempted to obtain workers' compensation insurance for its office staff, which, at the time, consisted of a small number of clerical employees. Using the services of an insurance broker, the plaintiff submitted applications to several different insurance companies. All of the plaintiff's applications were declined, however, based on the concern that the insurer would be responsible for claims involving the HCPs because their status as independent contractors was uncertain.

The plaintiff then applied for workers' compensation insurance for its office staff through the assigned risk market,[4] operated by the National Council on Compensation Insurance, Inc. (council).[5] The application, dated May 15, 2006, contained an estimated premium of $1031, which had been determined by the broker based on information supplied directly by the plaintiff regarding its office staff. Thereafter, the plaintiff received a full policy binder from the council on May 26, 2006, which

[3] Although the plaintiff's flyer does represent that the plaintiff conducts follow-up calls to evaluate the HCP's performance, Beverly Anglin, the plaintiff's president, testified on behalf of the plaintiff at trial that such calls are not frequently made in practice.

[4] Employers who are unable to obtain workers' compensation insurance coverage through the voluntary insurance market must apply for coverage through the assigned risk market. See *ED Construction, Inc.* v. *CNA Ins. Co.*, 130 Conn. App. 391, 394 n.3, 24 A.3d 1 (2011).

[5] The council is the Residual Market Plan Administrator for Connecticut. See *ED Construction, Inc.* v. *CNA Ins. Co.*, 130 Conn. App. 391, 395 n.4, 24 A.3d 1 (2011).

identified the defendant as the assigned carrier for coverage beginning on June 1, 2006. Soon after July 5, 2006, the plaintiff received a copy of the actual workers' compensation insurance policy issued by the defendant. The policy contained a provision that provided for an audit of the insured's records and also alerted the insured that "[i]nformation developed by audit will be used to determine final premium."

Thereafter, the defendant asked the plaintiff to comply with supplementary information requests. Specifically, the defendant sent the plaintiff a "Supplementary Underwriting Information Request" on June 15, 2006, asking for additional information such as tax forms and wage reports, the completion of a contractor questionnaire, and a copy of the plaintiff's brochure.

On July 12, 2006, the plaintiff received a letter from the defendant asking it to provide valid proof that a specified list of HCPs associated with the plaintiff had provided the plaintiff with certificates that they carried workers' compensation insurance coverage for themselves. The defendant sought this information in order to complete its underwriting file. Although the plaintiff was able to provide the defendant with professional liability insurance certificates for each named individual, it was unable to provide workers' compensation insurance certificates for any of them.[6] Soon thereafter,

---

[6] Beverly Anglin testified at trial that the defendant did not communicate to her that it wanted workers' compensation—and not professional liability—insurance certificates related to the HCPs. The record, however, belies this claim. The court received evidence that both the "Contractors Questionnaire" and the letter the plaintiff received requesting such information specified that the defendant wanted "workers' compensation certificates of insurance" for each subcontractor. On the basis of this record, it is apparent that the defendant was requesting proof of *workers' compensation* insurance coverage for each listed individual to establish whether those individuals needed to be included in its calculation of its risk exposure in determining the final premium. Moreover, the policy, as adduced at trial, included part five, section C, titled, "Remuneration," which states that the calculation of the premium is based on the remuneration paid or payable to "[a]ll other persons engaged in work that could make us liable under Part One . . . of

however, the plaintiff received another letter from the defendant requesting that the plaintiff set up an appointment with one of the defendant's auditors pursuant to the policy's provisions that provide for such audits as a vehicle to assist the defendant in determining the amount of the premium to assess the plaintiff.[7] Based on its ensuing audit, the defendant determined that the HCPs fell within Connecticut's definition of employee and would thus be afforded benefits under the Workers' Compensation Act (act).[8] General Statutes § 31-275 et seq. Accordingly, on November 21, 2006, the defendant added an endorsement to the policy that reflected the changed premium basis and a new estimated premium of $89,898. Following further discussions between the parties, the defendant issued the plaintiff a premium bill with an adjusted amount of $66,353 due on December 7, 2006.[9] When the plaintiff refused to pay the higher premium, the defendant cancelled the policy, effective on December 6, 2006.

The plaintiff commenced the present action on March 8, 2007, by filing a two count complaint in which it sought, as to the first count, a declaratory judgment that the defendant is legally obligated to cover the plaintiff with the policy for the estimated premium of $1069

this policy . . . This paragraph 2 will not apply if you give us *proof that the employers of these persons lawfully secured their workers compensation obligations.*" (Emphasis added.)

[7] The letter stated in relevant part: "As provided in the policy provisions, the estimated premium basis for your insurance policy(s) is subject to adjustment. Your audit will consist of a review of certain financial records such as, but not limited to, payroll/sales reports and tax forms. These records, and others, will help to determine the proper insurance premium based on the coverage provided."

[8] General Statutes § 31-275 (9) provides in relevant part: "(A) 'Employee' means any person who: (i) Has entered into or works under any contract of service or apprenticeship with an employer, whether the contract contemplated the performance of duties within or without the state . . . ."

[9] The defendant later conducted a final audit in which it determined a final premium amount of $67,069.

and that it is not responsible for paying an increased premium of $103,813[10] and, in the second count, monetary damages for the defendant's alleged breach of the covenant of good faith and fair dealing. The defendant filed its operative counterclaim on November 10, 2009, alleging two counts of breach of contract based on the plaintiff's failure to remit the final premium requested. The counterclaim additionally sought dismissal of the plaintiff's complaint and monetary relief.[11] Following a two day trial to the court and the submission of posttrial briefs, the court issued its memorandum of decision on August 3, 2012, in which it found that the HCPs were employees of the plaintiff and, therefore, that liability might be imposed on the defendant to defend any workers' compensation claims for benefits by the HCPs. The court also found that § 31-292 imposed liability on the plaintiff to provide workers' compensation benefits to the HCPs as workers on temporary loan. On that basis, the court thus rendered judgment in favor of the defendant as to both counts of the plaintiff's complaint and as to the defendant's counterclaim in the amount of $66,353. The plaintiff then filed the present appeal. Additional facts will be set forth as necessary.

I

With respect to count one of its complaint, the plaintiff first argues that the court improperly determined

[10] The defendant claimed that the plaintiff only owed $66,000, after conducting further audits and subtracting the amount the plaintiff had already paid to the defendant.

[11] In its counterclaim, the defendant made several claims concerning the plaintiff's alleged breach of contract. In its first count, the defendant claimed that the HCPs were the plaintiff's employees and that, as such, the plaintiff breached the express terms and conditions of the policy by failing to permit the defendant to inspect its workplace and records to calculate the final premium and by failing to pay the premium due under the policy. Whether the plaintiff actually cooperated with the defendant during the final stages of the final audit was a point of contention at trial. In the second count of its counterclaim, the defendant argued, in the alternative, that if the HCPs were independent contractors, the plaintiff's failure to pay the premium due under the policy still constituted a breach of contract.

that the HCPs were the plaintiff's employees. The plaintiff next claims that in its analysis of the HCPs' status as employees, the court incorrectly concluded that the plaintiff would be responsible for providing workers' compensation benefits to the HCPs pursuant to § 31-292. We agree with the plaintiff.

## A

The plaintiff first claims that the court improperly determined that the HCPs were the plaintiff's employees and not independent contractors. We agree with the plaintiff.

We first set forth the applicable standard of review that governs the plaintiff's first claim. "The determination of the status of an individual as an independent contractor or an employee is often difficult . . . and, in the absence of controlling circumstances, is a question of fact. . . . Thus, the plaintiff's claim requires us to review a finding of fact. . . . A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction

that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Rodriguez* v. *E.D. Construction, Inc.*, 126 Conn. App. 717, 727–28, 12 A.3d 603, cert. denied, 301 Conn. 904, 17 A.3d 1046 (2011). Accordingly, we review the trial court's determination that the HCPs are employees as a question of fact. Doing so, our query must be whether the court's conclusions were clearly erroneous.

While we defer to a trial court's findings of fact when they are supported by the record, our deference is not unlimited. Indeed, as to the factual question for the court as to whether the HCPs are employees or independent contractors, decisional law aids our analysis. As a general proposition: "The fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work. . . . It is the totality of the evidence that determines whether a worker is an employee under the act, not subordinate factual findings that, if viewed in isolation, might have supported a different determination. . . . For purposes of workers' compensation, an independent contractor is defined as one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work. . . . Many factors are ordinarily present for consideration, no one of which is, by itself, necessarily conclusive. While the method of paying by the hour or day rather than by a fixed sum is characteristic of the relationship of employer and employee, it is not decisive. . . . Nor is it decisive that the injured party uses his own tools and equipment. . . . The retention of the right to discharge, upon which the finding is silent, is a strong, but again not a controlling, indication that the relationship is one of employment. . . . Other persuasive factors that a person is holding

oneself out to be an independent contractor include the issuance of 1099 federal tax forms . . . and engaging independently in business with third parties and doing business apart from the putative employer under a different name." (Citations omitted; internal quotation marks omitted.) Id., 728–29.

Put succinctly, "[o]ne is an employee of another when he renders a service for the other and when what he agrees to do, or is directed to do, is subject to the will of the other in the mode and manner in which the service is to be done and in the means to be employed in its accomplishment as well as in the result to be attained. . . . The controlling consideration in the determination whether the relationship of master and servant exists or that of independent contractor exists is: Has the employer the *general authority to direct what shall be done and when and how it shall be done*— the right of general control of the work?" (Citation omitted; emphasis added.) *Kaliszewski* v. *Weathermaster Alsco Corp.*, 148 Conn. 624, 629, 173 A.2d 497 (1961). In contrast, "[a]n independent contractor relinquishes control to the entity that hires him or her of the results of his or her work only . . . ." 2 A. Sevarino, Connecticut Workers' Compensation After Reforms (J. Passaretti ed., Centennial Ed. 2012), § 4.13, p. 427.

With those principles in mind and recognizing that our task is not to decide whether the HCPs are employees or independent contractors but, rather, to assess whether the trial court reasonably could have concluded that they are employees, we review the relevant evidence available to the court in making its decision.

On the basis of our review, we conclude that the evidence presented at trial was insufficient to support the court's finding that the HCPs were the plaintiff's employees because there was no evidentiary basis for the court to conclude that the plaintiff had the authority

to control the mode or manner in which the HCPs performed their services for the health care facilities to which they had been sent by the plaintiff.[12]

In *Latimer* v. *Administrator*, 216 Conn. 237, 579 A.2d 497 (1990), our Supreme Court considered a trial court determination that certain health care registry workers (workers) were employees and not independent contractors. While the legal setting in *Latimer* was not identical to the present case, the court's analysis on review contains helpful guidance. In *Latimer*, the issue was whether the plaintiff employed the workers as employees under the Unemployment Compensation Act, thus owing contributions to the unemployment compensation fund. See id., 239. In agreeing with the conclusions of the administrator of the Unemployment Compensation Act that the workers were the plaintiff's employees, the court focused, inter alia, on the administrator's findings that: (1) the workers reported their day-to-day activities to the plaintiff; (2) the plaintiff retained the right to discharge any workers; (3) the plaintiff established the workers' schedules; (4) the plaintiff directed the workers to perform personal errands and to adhere to specific instructions concerning his care; (5) any needed equipment or materials were furnished by the plaintiff himself; and (6) the workers were not in a position to realize a profit or suffer a loss based on the service that they provided but were, instead, paid an hourly wage directed by the plaintiff. Id., 250. In affirming the judgment of the trial

---

[12] In its memorandum of decision, the court noted that two workers' compensation claims had been filed against the plaintiff by two different HCPs in the past. One such claim was adjudicated by a workers' compensation commissioner, who, rejecting the plaintiff's claim, determined that the HCP claimant was an employee and ordered the plaintiff to pay benefits owed to the claimant under the act. The second claim was settled for $15,000. There is nothing in the record to indicate, nor do the parties argue, that we are bound by the commissioner's findings and the litigants' agreement in those two instances.

court, which upheld the decision of the administrator, our Supreme Court ultimately determined that the fact that the workers reported their day-to-day activities to the plaintiff "embodies the logical inference that the reporting and monitoring had a purpose and that, if the care given the plaintiff were unsatisfactory, [the plaintiff] could, and would, intervene and take corrective measures." Id., 250–51. The court opined: "That right of intervention, which we believe clearly exists under the facts, evinces a right to control and direct the [workers] by the recipient of their services. The reporting of their day-to-day activities to [the plaintiff] by the [workers] and the monitoring of those activities by [the plaintiff], who possessed the right to discharge the [workers], is hardly indicative of the degree of independence that distinguishes an independent contractor from an employee. That the [workers] were permitted to perform their day-to-day duties without interference so long as those duties were performed in a satisfactory manner does not militate against a conclusion of control." Id., 251.

Conversely, in the present case, while the plaintiff did retain the ability to terminate the services of an HCP at any particular client's facility, the plaintiff had no authority to control the manner in which the HCPs performed their services for individual clients, nor did the plaintiff have any ability to affect the manner of services except by termination of the assignment. Once an HCP accepted an assignment, the HCP provided his or her own transportation, tools, and supplies and controlled the manner in which they cared for the client.[13] Additionally, the record reveals that there was no

---

[13] See also *Nationwide Mutual Ins. Co.* v. *Allen,* 83 Conn. App. 526, 536, 850 A.2d 1047 ("[T]he fact that a worker did not have any significant investment in the materials or tools necessary to perform the job and that the necessary equipment or materials were furnished by the employer are factors that weigh in favor of a determination that the relationship between the plaintiff and [the worker] was that of employer-employee and not that of an independent contractor. . . . Even more important is the court's finding that [the

evidence that the plaintiff had any ability to supervise the HCP's manner of work or even to intervene to take any corrective action. Any instructions given to the HCP at the beginning of an assignment regarding the scope of the HCP's duties were generated by the client companies and merely passed on by the plaintiff to the HCP as part of explaining the nature of the duties required by the assignment.[14] Nothing in the record revealed that the plaintiff required or provided any training on how to care for a client, nor did the plaintiff provide the HCPs with any guidance on how to address different situations in the nursing context such as, for example, how to interact with a patient or properly care for a wound. The HCPs did not report back to the plaintiff either during the course of or after the completion of an assignment. Finally, as to the incidents of the plaintiff's relationship with the HCPs, the court heard no evidence that the plaintiff had any company policies to which the HCPs were required to adhere in discharging their responsibilities to client facilities.

While this court acknowledges that the plaintiff's ability to remove an HCP from an assignment may evince some measure of control over the HCP, we do not believe this means of indirect influence alone provides a sufficient basis for the trial court's conclusion that they are the plaintiff's employees because such an influence falls too short of evidence of the right to control the *mode and manner* in which the HCPs performed their duties. Evidence of the plaintiff's inability to control the mode and manner of the HCP's work performance should reasonably be considered with other

worker] never performed services for [the employer's] clients without [the employer] or someone else from [his] business being present." [Citation omitted.]), cert. denied, 271 Conn. 907, 859 A.2d 562 (2004).

[14] In its memorandum of decision, the court found that: "The plaintiff does not own, operate or manage any physical premises on which the HCP performs their assigned tasks. The only 'supervision' provided by the plaintiff relates to the specific requirements for the assignment which the plaintiff has received from the third party."

evidence of the relationship between the plaintiff and the HCPs. Here, we note as significant that: the plaintiff issued 1099 forms and not W-2 forms to the HCPs, treatment accorded independent contractors; the plaintiff identified the HCPs as independent contractors in its contracts with both the HCP and its third-party clients; and the HCPs retained the right to work for other referral agencies or employers while still contracting with the plaintiff.[15] These factors, taken together, do not provide evidentiary support for the trial court's determination that the HCPs are employees.

In its memorandum of decision, the court found that "while the plaintiff may not exercise its right to control

---

[15] In signing a contract with the plaintiff, each third-party client acknowledged that: "All temporary nurses are independent contractors who provide their own insurance and are paid directly by [the plaintiff]. At all times hereunder, the nurses/certified nurses assistan[ts] provided to the facility by [the plaintiff] shall be independent contractors of the SUPPLIER only." (Emphasis in original.) Additionally, each HCP was required to sign an acknowledgment form in conjunction with its application, which stated: "In signing this form you are declaring that you are an independent contractor and in the event of injury you are not entitled to workers compensation benefits; that is, you work at your own risk. In the event of on the job injury you will not receive coverage for los[t] wages. Should you require such insurance, it is your responsibility to do so. As an independent contractor you will not be eligible for unemployment compensation at the termination of your assignment." Although the existence of this language declaring the HCP to be independent contractors is important to note when examining the totality of the evidence, we acknowledge that merely labeling the HCP as an independent contractor is not dispositive. See 2 A. Sevarino, supra, § 4.13.2, p. 431 ("[t]he mere labeling of the employment relationship as an independent contractor by the parties may not prevent a Workers' Compensation Commissioner from finding that the injured worker is in fact an employee based upon the actual work relationship"); see also *Latimer* v. *Administrator*, supra, 216 Conn. 251–52 ("Language in a contract that characterizes an individual as an independent contractor [rather than an employee] is not controlling. The primary concern is what is done under the contract and not what it says. . . . Such provisions in a contract are not effective to keep an employer outside the purview of the act when the established facts bring him within it. We look beyond the plain language of the contract to the actual status in which the parties are placed." [Citations omitted; internal quotation marks omitted.]).

the means and methods of work of the HCP, the plaintiff has the right to do so." This conclusion by the court, however, lacks evidentiary support because there is no evidence in the record to indicate that the plaintiff either exercised or had the right to exercise control over the means and methods of the HCP's work. In light of the foregoing, we conclude that the court's determination that the HCPs are employees was clearly erroneous.

B

The plaintiff next argues that the court incorrectly concluded that it would be responsible for providing workers' compensation benefits to the HCPs pursuant to § 31-292. We agree with the plaintiff.

Whether § 31-292 applies to the facts of this case raises a question of statutory construction, which is a "[question] of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply." (Internal quotation marks omitted.) *State* v. *Marsh & McLennan Cos., Inc.*, 286 Conn. 454, 464, 944 A.2d 315 (2008).

Section 31-292 provides: "When the services of a worker are temporarily lent or let on hire to another person by the person with whom the worker has entered into a contract of service, the latter shall, for the purposes of this chapter, be deemed to continue to be the employer of such worker while he is so lent or hired by another." We believe § 31-292 is inapplicable to the present dispute because that statute assumes that the worker is, in fact, an employee, and merely states that one who hires out an employee on a temporary basis remains liable for that person's workers' compensation coverage during the period the worker is on loan. In short, because the statute begs the question as to the

present dispute, its provisions are not an aid to our analysis. See 2 A. Sevarino, supra, § 4.12, p. 424. ("given the temporary nature of the lending or letting for hire to another, the required employer-employee relationship between the injured worker and the lending employer must not only have existed immediately before the lending occurred but must also have been contemplated to have resumed after the lending").

Put simply, § 31-292 is meant to address an employer's liability for workers' compensation coverage in instances where the employee may not be working for the employer at the time of injury. See *Derrane* v. *Hartford*, 295 Conn. 35, 45, 988 A.2d 297 (2010) ("the act generally renders employers responsible for injuries sustained by their employees, regardless of where those injuries occurred, whenever those employees are acting within the scope of their employment, *even when such employees are temporarily lent to other entities*" [emphasis added]). Based on our analysis of the language and import of § 31-292, we conclude that the court incorrectly determined that its provisions would have obligated the plaintiff to provide workers' compensation benefits to the HCPs.

II

The plaintiff finally claims that the court erred in determining that the defendant had a contractual right to charge the plaintiff a higher policy premium based on its classification of the HCPs as employees. Specifically, the plaintiff argues that because it only signed an application for assigned risk coverage, the defendant's argument that it could still charge the plaintiff an increased premium based on the "payroll and all other remuneration paid or payable during the policy period for all services of . . . [a]ll other persons engaged in work that could make [the defendant] liable under . . . this policy" is misplaced. We are not persuaded.

The following additional facts are relevant to the resolution of the plaintiff's final claim. At trial, Steven Kidd, an audit manager for the defendant, testified concerning the defendant's audit procedures for workers' compensation insurance policies. Kidd testified that when an application is submitted to the council and given to the defendant as the assigned risk carrier, the defendant typically orders an audit survey at the beginning of the policy period to verify the defendant's exposure and to evaluate the insured's business operations. After the end of the policy period, the defendant then conducts a final audit to verify the actual premium owed based on the appropriate remuneration figures and rate classifications.[16] Upon completing the initial audit of the plaintiff's business operations, Kidd stated that the defendant became aware that it had "additional exposure" beyond what was provided for in the premium estimate. In essence, although the premium estimate—which was calculated by the plaintiff's broker based on information provided by the plaintiff—indicated coverage only for the plaintiff's office staff, the defendant's audit indicated that the HCPs were also part of its exposure to risks entailed in insuring the plaintiff. Kidd testified that upon discovering the additional risk exposure, the auditor submitted the audit file to the underwriter, who then endorsed the policy to account for the defendant's additional exposure and charged an accurate premium accordingly. In addition to describing the defendant's audit procedures, Kidd also testified that the defendant's duty to defend under the policy applied to all claims made against the policy, regardless of the claimant's classification as an employee or independent contractor. Kidd elaborated by stating that "the policy covers all [of] the workers'

---

[16] Kidd testified that remuneration is "essentially the term that insurance carriers—we use within the industry to—to describe exposure for a policy. It includes payroll to employees. It could include payroll to uninsured subcontractors or cash payments to—to contract labor."

compensation and employer's liability. . . . So, regardless of what we charged in premium, we're . . . insuring all those liabilities out there and in this case we determined that there were much more—we had much more of a liability than was disclosed on the . . . application." When asked if an employer seeking workers' compensation coverage could do so only for select employees, Kidd replied "No. . . . [E]ssentially the policy is written to cover the liabilities of . . . the named insured."

We first set forth the well established legal principles that govern insurance coverage disputes and the applicable standard of review that governs the plaintiff's final claim. "[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the

language used in the contract rather than from one party's subjective perception of the terms. . . .

"[A] trial court's resolution of factual disputes that underlie coverage issues is reviewable on appeal subject to the clearly erroneous standard. . . . Such a finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [A] finding is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Thus, [i]t is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *National Fire Ins. Co. of Hartford* v. *Beaulieu Co., LLC*, 140 Conn. App. 571, 577–78, 59 A.3d 393 (2013).

Our decision in *National Fire Ins. Co. of Hartford* provides guidance for our analysis of this claim. In *National Fire Ins. Co. of Hartford*, the defendant appealed from the underlying civil action in which the plaintiff successfully sought unpaid workers' compensation insurance coverage premiums. Id., 573. The dispute between the parties concerned whether certain workers should have been included in the premium recalculation, which increased the premiums by an

additional $46,529, based on the plaintiff's audit of the defendant's business operations. Id., 575–76. In its memorandum of decision, the trial court stated: "[T]he plaintiff is entitled to include in its premium recalculation all persons or entities, whether employees of the defendant or not, for whom the plaintiff may be liable to pay workers' compensation benefits, unless the defendant proves that such coverage was otherwise provided. . . . [E]ven if all of the . . . [workers] were independent contractors rather than employees, the plaintiff was entitled to additional premiums for their work with the defendant because they all fit within part five C 2 of the insurance policy in that they engaged in work that could make the plaintiff liable to provide workers' compensation benefits." (Internal quotation marks omitted.) Id., 576–77. Although, on appeal, this court concluded that the trial court did not make an express finding that the workers at issue were "employees," we nevertheless found that it was sufficient for the court to have determined that the workers in question fell within the "penumbra" of the policies because they engaged in work that could make the plaintiff liable to provide workers' compensation benefits. See id., 579–80. In sum, the insurer in *National Fire Ins. Co. of Hartford* was entitled to assess a premium based on its exposure or risk of having to cover certain employees even if it could later be determined that they were ineligible for workers' compensation as employees.

Similarly, the circuit court decision in *Hartford Accident & Indemnity Co.* v. *Capital Home Improvement Co., Inc.*, 2 Conn. Cir. Ct. 664, 205 A.2d 192 (1964), lends further support to the defendant's contention that it was contractually entitled to receive the increased premium regardless of whether or not the HCPs actually were employees. In finding for the plaintiff insurer, the court in *Hartford Accident & Indemnity Co.* found that a workers' compensation policy with provisions similar

to those in the present case, was "a contractual right (a right which the plaintiff could and did provide for in the policies) to be compensated for the possibility that a claim or suit may render the plaintiff liable. The existence of the possibility of such liability and the assumption of such a risk, aside from the question of, or a final adjudication as to, whether or not the installers were independent contractors, entitled the plaintiff to charge a premium therefor. It is the assumption of this burden of paying possible compensation that gives the plaintiff the right to charge premiums. . . . The responsibility assumed and the risk and inconvenience to which the plaintiff was exposed, of themselves, constituted a consideration for the premium charged." (Citation omitted.) Id., 669–70. The court continued: "by the terms of the policies the plaintiff agreed to defend any proceeding instituted against the defendants by installers seeking benefits thereunder. This is a positive undertaking by the plaintiff requiring it to expend funds in so doing. The plaintiff's duty to defend has a broader aspect than its duty to indemnify. There is a distinction between liability and coverage. The obligation of the plaintiff to defend does not depend on whether the injured party will successfully maintain a cause of action. The policy requires the plaintiff to defend irrespective of the ultimate outcome." Id., 670.

In the present case, the workers' compensation insurance policy issued by the defendant contains multiple provisions that establish the defendant's risk exposure concerning the plaintiff's business operations. Perhaps most telling is the defendant's obligation to indemnify the plaintiff, contained in part one, section C of the policy, titled, "We Will Defend," which states in relevant part: "We have the right and duty to defend at our expense any claim, proceeding or suit against you for the benefits payable by this insurance." Under this provision of the policy, if an HCP filed a claim against

the plaintiff for workers' compensation benefits, the defendant would be contractually required to defend any claim at their expense. If, for example, the defendant were not entitled to collect a premium from the plaintiff based on its risk exposure but, instead, based solely on the plaintiff's contentions that the HCPs were independent contractors, the defendant would be indemnifying the entirety of the plaintiff's risk in exchange for little compensation. This duty to defend would require the defendant to represent the plaintiff in any dispute filed by any potential claimant regardless of whether the plaintiff intended to cover the particular claimant under its workers' compensation policy.

Finally, the plaintiff's claim that it only signed the application for insurance and, thus, that it is "not contractually obligated to pay an increased premium based merely on the possibility that a health care worker could be determined to be an employee," is legally and factually incorrect.[17] Although the plaintiff only signed the workers' compensation application, at no time did the plaintiff contest its coverage or the existence of a contractual relationship with the defendant. In fact, the plaintiff's argument is flawed in that it argues that it is *not* bound by the policy provisions providing for audits and potential increased premiums while simultaneously

---

[17] In its brief, the plaintiff argues that: "[T]his is not a situation where the plaintiff filled out an application to be covered by a policy of workers' compensation insurance issued by the defendant, in which it agreed to be bound by a provision of this type." The plaintiff argues, as well, that in the present case it "filled out an application to the assigned risk pool of the [w]orkers' [c]ompensation [p]lan. The application signed by the plaintiff does not include a provision which gives the defendant the right to increase the premium based on potential liability to the defendant. The plaintiff does not dispute that the application commits the plaintiff to interim audits, and increased premiums if health care professionals are determined to be employees and not independent contractors. However, the plaintiff is not contractually obligated to pay an increased premium based merely on the possibility that a health care worker could be determined to be an employee."

arguing that the defendant *is* bound to cover the plaintiff with the very policy the plaintiff contests. That being said, multiple provisions in the policy provide that the plaintiff is contractually obligated to pay a higher premium if an audit establishes a different risk exposure on the defendant's part. First, part five, section E, titled, "Final Premium," states that "[t]he final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance." Beverly Anglin testified at trial, on behalf of the plaintiff, that she received a copy of this policy in response to its application. Accordingly, the plaintiff should have been aware that it could become contractually obligated to pay a higher premium than that originally estimated in the application it signed. Second, part five, section C, titled, "Remuneration," states in relevant part: "This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of: [1] All your officers and employees engaged in work covered by this policy; and [2] All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. . . . This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations." Much like the policies in *National Fire Ins. Co. of Hartford* and *Hartford Accident & Indemnity Co.*, the policy provisions in the present dispute provide that the defendant may charge a premium—potentially different from the premium originally estimated at the inception of the contractual relationship—based on its risk exposure regardless of whether the HCPs are classified as employees or independent contractors. In addition, the contract itself

explicitly provided that the final policy premium would be determined after the policy period ended. Accordingly, we find that the defendant had the contractual right to charge the plaintiff the increased premium based on its final audit of the plaintiff's business operations, which demonstrated a much higher risk exposure on the defendant's part than originally estimated.

The judgment is reversed with respect to the first count of the plaintiff's complaint and the case is remanded with direction to render judgment for the plaintiff on that count; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.